**\*NOT FOR PUBLICATION\***

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MAGIC REIMBURSEMENTS LLC,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>T-MOBILE USA, INC.,<br><br>　　　　　　Defendant. | Civil Action No. 22-02121 (FLW)<br><br>OPINION |

**WOLFSON, Chief Judge:**

    This matter comes before the Court on a motion, filed by Defendant T-Mobile USA, Inc., ("T-Mobile"), to dismiss Plaintiff Magic Reimbursements LLC's ("Magic") claims, which sound in tort and equity, for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth herein, T-Mobile's motion is **GRANTED**.

**I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

    In a common practice among wireless carriers, T-Mobile, a Delaware corporation with its principal place of business located in Bellevue, Washington, entered into lease agreements (the "Leases") with third-party building owners (the "Landlords"), whereby T-Mobile contracted the right to install and operate cellular telecommunications equipment on the rooftops of the Landlords' properties. *See* ECF No. 1 ("Compl.") ¶¶ 2, 5. The Leases largely follow an industry template, which includes, among other things, a provision purportedly requiring T-Mobile to reimburse the Landlords for certain state and local taxes associated with the addition of the

1

telecommunications equipment to the Landlords' buildings. *Id.* ¶¶ 6–12. For years, pursuant to the Leases, T-Mobile routinely reimbursed Landlords in New York City, and elsewhere, for taxes owed by the Landlords. *Id.* ¶¶ 16–17. Recognizing this trend, Magic, a New Jersey limited liability company with its principal place of business located in Lakewood, New Jersey, entered into agency agreements with various Landlords in New York City for the purpose of representing and assisting the Landlords with respect to the tax reimbursements. *Id.* ¶¶ 1, 29. In furtherance of this endeavor, Magic developed a "proprietary claims package" for the tax reimbursements, which it submitted to T-Mobile on behalf of the Landlords. *Id.* ¶¶ 35–38. Throughout September and early October 2021, T-Mobile reviewed the claims packages and remitted tax reimbursement payments to Magic for the benefit of the Landlords. *Id.* ¶¶ 45–50. However, beginning in October 2021, T-Mobile allegedly began delaying its processing of the tax reimbursement claims submitted by Magic, reasoning that the claims required additional review and that the volume of claims submitted by Magic had strained T-Mobile's processing capabilities. *Id.* ¶¶ 51–55. Over the following months, despite Magic's repeated protests and T-Mobile's alleged past practice of expeditiously approving the reimbursement claims, T-Mobile continued to delay payments due to, what T-Mobile described as, internal audits and extended reviews of the claims. *Id.* ¶¶ 56–106. Ultimately, in March 2022, T-Mobile issued letters directly to Landlords, represented by Magic, informing the Landlords that their tax reimbursement claims had been denied. *Id.* ¶¶ 119–21. This action arises from Magic's business dealings with T-Mobile. Magic brought suit in its capacity as the authorized agent of the Landlords with respect to the tax reimbursements.

      A.      **Magic's Representation of the Landlords**

Magic formed its business in response to a perceived need for the representation of "Landlords throughout the United States who were unaware of or lacked the knowledge as to how

to calculate or seek property tax reimbursement" from wireless carriers such as T-Mobile. *Id.* ¶ 29. As noted above, the relevant Leases purportedly "required the Tenant to reimburse the Landlord for all increases in taxes (and other expenses) incurred by the Landlord due to the presence or installation of the Tenant's telecommunications equipment on the Landlord's building." *Id.* ¶ 8. However, according to Magic, local and state tax authorities apply different methods and nomenclature in their assessment of real estate tax. *Id.* ¶ 9. For instance, taxes associated with the telecommunications equipment may be called "personal property taxes" or "real property taxes," depending on the jurisdiction and the corresponding language of the relevant Lease. *Id.* ¶ 10. Additionally, tax authorities may utilize different real estate valuations in their calculation of taxes owed. *Id.* ¶ 11. As a result, Magic alleges that "many Landlords were unaware of, or didn't know how to calculate or seek reimbursement from Tenants for the portion of the property taxes resulting from the presence of the Cell Tower(s) on their properties." *Id.* ¶ 13.

In assessing the tax reimbursement claims that some Landlords did submit, however, T-Mobile, as alleged, "routinely and consistently reimbursed" the taxes owed under the relevant Lease. *Id.* ¶ 17. In the early 2000s, T-Mobile purchased various competitors in the wireless industry and assumed the Leases related to their telecommunications equipment. *Id.* ¶ 20–21. In order to handle various issues related to the growing number of Leases, including tax reimbursement claims, T-Mobile purportedly established a lease department ("Lease Department"), which is responsible for interfacing with the Landlords. *Id.* ¶ 22. T-Mobile's Lease Department employs numerous "Lease Specialists," who are tasked with processing, reviewing, and approving tax reimbursement claims arising from the Leases. *Id.* ¶ 23. For the past decade, according to Magic, the T-Mobile Lease Department has processed and approved "hundreds of property tax reimbursement claims submitted by Landlords whose buildings are

3

located in the New York, NY, including repeatedly approving and paying the amount claimed regardless of whether the tax clause in the Telecom Lease referred to the tax as a real property tax, generalized, or personal property tax." *Id.* ¶ 27.

Based on the fact that many Landlords had yet to recoup property taxes allegedly owed to them under the Leases and that T-Mobile had historically approved such reimbursement requests when properly made, Magic set out to "recover the hundreds of millions of dollars that . . . T-Mobile (and the companies which it acquired), owed to Landlords" due to the presence of telecommunications equipment. *Id.* ¶ 29. In doing so, Magic prepared "test cases" on behalf of Landlords in New York City, by which it sought to confirm that T-Mobile approved of its method for calculating the tax reimbursements. *Id.* ¶ 31. Magic submitted test reimbursement claims to T-Mobile based on Leases "that included varying reimbursement clauses, including clauses that used the 'real estate tax' and 'personal property tax' nomenclature." *Id.* ¶ 32. T-Mobile vetted and approved the test claims submitted by Magic and remitted payment for the full amount of the property tax reimbursement claimed. *Id.* ¶ 33.

Following the success of the test cases, in the fall of 2021, Magic began to market its ability to assist Landlords located in New York City in submitting claims for property tax reimbursements from T-Mobile. *Id.* ¶ 35. A number of Landlords entered into contracts with Magic "to act as their authorized agent to submit claims to T-Mobile." *Id.* ¶ 37. As the Landlords' agent, Magic assessed the relevant Leases and New York City tax records for each Landlord. *Id.* ¶ 38. Magic then compiled the relevant information into a "Claim Package" for each Landlord and submitted it to T-Mobile's Lease Department. *Id.* Each Claim Package included a cover letter from Magic, the agency agreement between Magic and the particular Landlord, relevant property valuations and tax bills prepared by the New York City Department

of Finance, and a spreadsheet detailing how Magic had calculated the taxes attributable to the presence of T-Mobile's telecommunications equipment under the particular Lease. *Id.* ¶¶ 39–44. Similar to the test claims, T-Mobile's Lease Department allegedly approved the tax reimbursements based on dozens of Claim Packages submitted by Magic throughout September and early October 2021. *Id.* ¶ 45. During this time, the Lease Department allegedly communicated directly with Magic regarding any questions related to the Landlords' reimbursement claims and remitted all payments—totaling approximately $15 million—to Magic in accordance with the agency agreements.[1] *Id.* ¶¶ 45–50.

B.   **T-Mobile's Review and Denial of the Tax Reimbursement Claims**

In October 2021, according to Magic, T-Mobile began delaying its processing of the tax reimbursement claims submitted by Magic. *Id.* ¶ 51. One T-Mobile Lease Specialist informed Magic that the numerous pending Claim Packages were being reviewed by T-Mobile's Tax Department. *Id.* ¶ 52. In response to various inquiries from Magic, T-Mobile allegedly explained that it was "experiencing unprecedented volumes" of reimbursement claims via Magic. *Id.* ¶ 55. Magic, in turn, expressed concern to T-Mobile that the review was damaging Magic's business relationship with the Landlords, as Magic was unable to provide the Landlords with an explanation for the delay. *Id.* ¶ 56. On October 29, 2021, T-Mobile completed its review of the pending Claim Packages and approved the claims. *Id.* ¶ 64. A similar processing delay occurred in November 2021. But, following correspondence between Magic and T-Mobile, in which T-Mobile allegedly acknowledged the "slow downs" and requested Magic's patience in the matter, "[m]ultiple million dollars in claims were processed, approved, and paid in November and into early December."

---

[1] Although not alleged in the Complaint, it appears that Magic is compensated based on a fee structure, contingent upon T-Mobile's payment of the Landlords' tax reimbursement claims.

*Id.* ¶ 70.

As alleged, in late December 2021, however, T-Mobile's approval and payment of the reimbursement claims submitted by Magic ceased. *Id.* ¶ 72. On December 15, 2021, T-Mobile's Lease Department purportedly notified Magic that it had approved payment for four claims totaling approximately $387,000, but Magic alleges it never received such a payment. *Id.* ¶ 72. When Magic inquired about the payment, Magic was allegedly advised to discontinue its communications with T-Mobile's Lease Specialists and to send any further inquiries to T-Mobile's general property management email address. *Id.* ¶ 73. On January 3, 2022, Magic emailed its previous contact in the Lease Department and explained the situation. *Id.* ¶ 76. Magic avers that the Lease Department contact replied that "The last batch of invoices were put on hold for audit. This is part of our regular practice and they will be issued once cleared. You are submitting a large volume of invoices and we are performing our due diligence and will pay once cleared from audit." *Id.* ¶ 77. Magic alleges this was a willful misrepresentation made in furtherance of T-Mobile's plan to stop processing claims submitted by Magic and destroy Magic's relationship with the Landlords. *Id.* ¶¶ 78–85.

On January 21, 2022, in response to Magic's further attempts to contact T-Mobile about the processing delays, T-Mobile's Director of the Network Supply Chain & Partner Management Department allegedly emailed Magic, stating that "T-Mobile is looking into the validity and accuracy of the back tax billings and will advise when we have concluded our review." *Id.* ¶ 91. Magic replied on January 25, 2022, asserting that it believed T-Mobile was engaging in "obstructive conduct" and a "purposeful effort to damage" Magic's reputation with its clients. *Id.* ¶ 99. Magic further explained that although it had initially "established a workable line of communication [with T-Mobile] that permitted the processing, vetting and approval of each claim

in a timely manner," T-Mobile's present conduct amounted to an "inexcusable delay" in payment of approved claims and processing of pending and new claims. *Id.* Magic also stated that if it did not receive a response by January 28, 2022, it would refer the matter to counsel for "immediate legal action" and would "seek authority" from the Landlords "to act on their behalf in prosecuting all possible claims against T-Mobile for breach of contract." *Id.* In response, T-Mobile continued to request Magic's patience as it completed its audit, and on February 16, 2022, T-Mobile allegedly advised Magic that it would be able to complete its review within 30 days and would discuss the results with Magic. *Id.* ¶¶ 106, 116.

On February 24, 2022, T-Mobile sent a letter directly to all the Landlords represented by Magic, in which T-Mobile stated that it was "engaged in a careful review of the currently outstanding invoices to determine if the real property tax reimbursement charges are proper and timely" and that its review would be completed within 30 days. *Id.* ¶ 107. Subsequently, in letters dated March 28–31, 2022 and addressed directly to the Landlords, T-Mobile denied the Landlords' pending tax reimbursement claims, and retroactively denied previously approved reimbursement claims, demanding repayment within 30 days. *Id.* ¶¶ 121–22. In the letters to each Landlord, T-Mobile explained that it believed "the invoice" for the respective reimbursement claim "was issued in error" by Magic. *Id.* ¶ 125. Magic alleges that, despite T-Mobile's representations and the agency agreements, T-Mobile did not share the results of its audit with Magic prior to issuing denial letters to the Landlords. *Id.* ¶ 132. Magic further alleges that T-Mobile engaged in this course of conduct "in furtherance of its efforts to disparage Magic's business reputation and destroy its present and future business relationships with its clients." *Id.* ¶ 130.

### C. Procedural History

Magic filed its Complaint on April 12, 2022, asserting three causes of action: (i) tortious

interference with present and prospective business relations, (ii) defamation and commercial disparagement, and (iii) promissory estoppel. *See generally* Compl. T-Mobile moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6) on May 31, 2022. ECF No. 7 ("Def. Mot."). Magic opposed the motion to dismiss on July 7, 2022. ECF No. 17 ("Pl. Opp."). T-Mobile filed its reply on July 18, 2022. ECF No. 18 ("Def. Reply").

## II.     LEGAL STANDARD

### A.     Lack of Standing Under Rule 12(b)(1)

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). In adjudicating a motion to dismiss for lack of standing, "courts apply the standard of reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss for failure to state a claim: 'Court[s] must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party.'" *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243–44 (3d Cir. 2012) (quoting *Ballentine*, 486 F.3d at 810).

### B.     Failure to State a Claim Under Rule 12(b)(6)

Courts undertake a three-part analysis when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)) (alteration in original). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quotation omitted). In doing so, the court is free to ignore legal conclusions or factually

unsupported accusations that merely state, "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[M]ere restatements of the elements of [a] claim[ ] . . . are not entitled to the assumption of truth." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) (alterations in original) (quotation omitted). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

### III. <u>DISCUSSION</u>

T-Mobile argues that Magic's Complaint should be dismissed (i) because Magic lacks standing to pursue, through claims sounding in tort and equity, contractual relief that belongs exclusively to the Landlords, and (ii) because Magic has failed to state a claim arising from T-Mobile's conduct. *See* Def. Mot. 1–4. I find that, to the extent Magic seeks to recover in connection with T-Mobile's purported obligations under the Leases, Magic lacks standing to do so. But, regardless as to whether Magic has standing to pursue relief pursuant to the terms of the Leases, each of its three stated causes of action independently fail under Rule 12(b)(6).

#### A. Standing

As a preliminary matter, T-Mobile asserts that Magic lacks standing because its claims "arise out of purported breaches under the Leases for T-Mobile's refusal to pay the disputed tax claims" and that "[a]ny claims for breach of those obligations belong to the Landlords alone." Def. Mot. 1. T-Mobile further asserts that Magic is the Landlords' agent only with respect to its limited authority to submit reimbursement requests and receive payment on the Landlords' behalf—Magic is not an assignee of the Landlords' contract claims pursuant to the Leases. *Id.* at 2, 12. Magic

9

concedes that it is not entitled to pursue contractual claims on behalf of the Landlords, stating that "is an issue between T-Mobile and the Landlords and is not plead[ed] or otherwise identified in the Complaint as a cause of action." Pl. Opp. 25. However, because Magic's Complaint, in part, seeks relief that is governed by the terms of the Leases, the Court holds that such relief is unavailable to Magic.

Where a contract exists between two parties, "[i]f there is no intent to recognize the third party's right to contract performance, 'then the third person is only an incidental beneficiary, having no contractual standing.'" *Ross v. Lowitz*, 222 N.J. 494, 513 (2015) (citation omitted). And "an agent of a disclosed principal, even one who negotiates and signs a contract for her principal, does not become a party to the contract." *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 445 (3d Cir. 1999) (citing *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503 (3d Cir. 1994); Restatement (Second) of Agency § 320 (1958)). Moreover, "[i]n the absence of specific authorization, an agent . . . cannot sue in his own name to recover compensation due to his principal." *Harper-Lawrence, Inc. v. United Merchants and Mfrs., Inc.*, 261 N.J. Super. 554, 567 (App. Div. 1993); *see Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 454 (3d Cir. 2018) ("An assignment purports to transfer ownership of a claim to the assignee, giving it standing to assert those rights and to sue on its own behalf.").

Here, the Leases are separate, individual contracts between each of the Landlords and T-Mobile. Compl. ¶¶ 5–21. Magic is not a party to the Leases, nor does it allege as much in the Complaint. Magic also does not allege that its agency agreements with the Landlords specifically authorize it to seek compensation pursuant to the Leases through legal action on behalf of the Landlords. Rather, the only specific authorization in the agency agreements pertains to Magic's duty to "submit[] real estate tax reimbursement requests and receiv[e] payments," and Magic's

authority to "correspond" on the Landlords' behalf "to the extent necessary to effectuate these duties." Compl. ¶ 41. Although Magic argues that it does not seek to enforce contractual rights afforded solely to the Landlords under the Leases with this lawsuit, Pl. Opp. 24–26, key portions of its Complaint indicate the contrary. For example, Magic asks the Court to find that "T-Mobile be required to pay Magic the entirety of the amount claimed in each of the Claim[] Package[s] submitted to T-Mobile," and seeks "a declaratory judgment that T-Mobile is obligated to pay Magic the full amount claimed for property taxes attributable to the Cell Towers on any Telecom Lease." Compl. ¶ 153. Without specific authorization, Magic cannot pursue compensation allegedly due to the Landlords under the Leases. *See Harper-Lawrence, Inc.*, 261 N.J. Super. at 454. Thus, to the extent Magic seeks to enforce contractual rights against T-Mobile in this suit, it lacks standing.

However, this conclusion does not end the Court's analysis as Magic frames its three causes of action as sounding in tort and equity, not contract. As discussed *infra*, construing the Complaint in the most favorable light, Magic fails to state a claim arising from T-Mobile's business dealings and decision to deny the Landlords' tax reimbursement requests.

### B. Failure to State a Claim

Pursuant to Fed. R. Civ. P 12(b)(6), T-Mobile argues that Magic fails to state a claim as to each of its three causes of action: (i) tortious interference with present and prospective business relationships, (ii) defamation and commercial disparagement, and (iii) promissory estoppel. Def. Mot. 13–28. In opposition, Magic largely reasserts conclusory allegations from its Complaint, without citation to case law and without addressing T-Mobile's substantive legal arguments. Pl. Opp. 27–40. For the reasons set forth below, Magic fails to set forth an actionable claim arising from T-Mobile's alleged conduct.

11

### 1. *Tortious Interference (Count I)*

To state a claim for tortious interference with existing or prospective business relations, a plaintiff must establish "(1) a protected interest; (2) malice—that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." *New Jersey Physicians United Reciprocal Exch. v. Boynton & Boynton, Inc.*, 141 F. Supp. 3d 298, 309 (D.N.J. 2015) (quoting *Vosough v. Kierce*, 437 N.J. Super. 218, 234 (App. Div. 2014)).[2]

Magic's tortious interference claim fails for two reasons.  First, although Magic may have a protected interest in its business relationships with the Landlords, Magic does not plead facts that demonstrate T-Mobile's conduct actually interfered with those present or prospective relationships.  Indeed, "there are no allegations that [the Landlords] ceased their relationship with [Magic]." *New Jersey Physicians*, 141 F. Supp. At 310.  "Nor is [Magic's] vague allegation that unknown, prospective customers may have been lost sufficient to survive dismissal." *Id.*; *see Advanced Oral Techs., L.L.C. v. Nutrex Research, Inc.*, No. 10-5303, 2011 WL 1080204, at *4 (D.N.J. Mar. 21, 2011) ("Plaintiff must allege an injury that is more concrete than lost business of unknown, unsolicited, or hypothetical customers.") (internal quotations and citation omitted). Instead, Magic asserts in conclusory terms that "T-Mobile had to destroy Magic's business relationship with its current and future clients, in hopes that the Landlords would return to the blissful ignorance they had shown for decades relating to their contractual rights to property tax reimbursements pursuant to the Telecom Leases." Compl. ¶ 98.  Magic further states that "[b]ut for the conduct of T-Mobile . . . Magic would have obtained hundreds of new Landlord clients." Compl. ¶ 141.  Such vague and conclusory allegations are insufficient. *See Nostrame v. Santiago*,

---

[2] For purposes of this motion, the parties agree that New Jersey law applies.

213 N.J. 109, 127–29 (2013) (affirming dismissal of tortious interference claim because "plaintiff's complaint is based on nothing more than his unsupported suspicion").

Second, Magic cannot establish that T-Mobile acted with malice, or without legal justification, in pursuing its understanding of its rights under the Leases. "An individual acts with malice when he or she intentionally commits a wrong without excuse or justification." *Dello Russo v. Nagel*, 358 N.J. Super. 254, 268 (App. Div. 2003) (quoting *Cox v. Simon*, 278 N.J. Super. 419, 433 (App. Div. 1995)). As such, "an unlawful interference exists where there is a 'luring away, by devious, improper and unrighteous means.'" *Hong Kong Ibesttouch Tech. Co. Ltd. v. iDistribute LLC*, No. 17-2441, 2018 WL 2427128, at *4 (D.N.J. May 30, 2018) (quoting *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016)). On the other hand, "the fact that a breaching party acted 'to advance [its] own interest and financial position' does not establish the necessary malice or wrongful conduct" for a tortious interference claim. *Dello Russo*, 358 N.J. Super. at 268 (quoting *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J. Super. 437, 451–52 (App. Div. 1976)).

Here, by denying the reimbursement claims of the Landlords made through Magic, T-Mobile has merely invoked contractual rights under the Leases to which it believes it is entitled. Such action in furtherance of its position under the Leases does not amount to malicious conduct. *See Dello Russo*, 358 N.J. Super. at 268. Insofar as Magic asserts that T-Mobile acted maliciously by directly communicating with the Landlords despite its knowledge of the agency agreements, Compl. ¶¶ 84–85, 108, 120, nothing in the agency agreements prohibited T-Mobile from contacting the Landlords directly, particularly since T-Mobile has a contractual relationship with the Landlords. Rather, the agreements simply authorized T-Mobile to "correspond with Magic Reimbursements LLC" as to the "antenna sites." Compl. ¶ 41. Even viewing Magic's allegations

of malice in totality—that is, T-Mobile denied the reimbursement claims and communicated directly with the Landlords for the purpose of destroying Magic's relationship with its clients due to the volume of claims Magic submitted—Magic cannot show that T-Mobile acted without a legal justification. The underlying contractual relationships between T-Mobile and the Landlords provides a legitimate basis for T-Mobile's course of action in challenging the reimbursement claims, regardless of whether its interpretation of the Leases is ultimately correct. Moreover, Magic does not point to any language or representations in the letters issued directly to the Landlords giving rise to the inference "devious, improper [or] unrighteous" tactics on T-Mobile's part. *Hong Kong Ibesttouch Tech. Co. Ltd.*, 2018 WL 2427128, at *4; Compl. ¶¶ 107–28.

Accordingly, because Magic fails to plead facts sufficient to show that T-Mobile intentionally interfered with Magic's relationship with its present or prospective clients resulting in damages or that T-Mobile acted with malice, Magic's tortious interference claim is dismissed.[3]

### 2. *Defamation and Commercial Disparagement (Count II)*

To succeed in a defamation action, a plaintiff must prove three essential elements: (1) that the defendant "made a false and defamatory statement concerning [the plaintiff]"; (2) "that the statement was communicated to another person (and not privileged)"; and (3) that the defendant "acted negligently or with actual malice." *G.D. v. Kenny*, 205 N.J. 275, 292–93 (2011). A claim

---

[3] T-Mobile asserts that Magic's claim also fails under the economic loss doctrine because Magic seeks "recovery on a contract claim in tort clothing." Def. Mot. 18 (quoting *G&F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 584, 588–89 (D.N.J. 2014) (internal quotations omitted)). However, the lack of contractual privity between Magic and T-Mobile would appear to render the economic loss doctrine inapplicable here. *See SRC Const. Corp. of Monroe v. Atlantic City Housing Auth.*, 935 F. Supp. 2d 796, 801 (D.N.J. 2013) (refusing to apply economic loss doctrine "where there is no direct contractual relationship between the plaintiff and the defendant" because "therefore any tort claim asserted cannot possibly be a contract claim in tort clothing"). Regardless, the Court need not address this issue in detail as Magic's tortious interference claim fails for the independent reasons stated *supra*.

for commercial disparagement similarly requires: "1) publication; 2) with malice; 3) of false allegations concerning its property, product or business, and 4) special damages, i.e. pecuniary harm." *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004).  In other words, the plaintiff must show "the publication of matter derogatory to plaintiff's business in general of a kind calculated to prevent others from dealing with plaintiff or otherwise to disadvantageously interfere with plaintiff's relations with others."  *Id.* (quoting *Binkewitz v. Allstate Ins. Co.*, 222 N.J. Super. 501, 516 n.8 (App. Div. 1988)).

"A statement is defamatory if it is false and is injurious to the reputation of another or exposes another person to hatred, contempt or ridicule or subjects another person to a loss of the good will and confidence in which he or she is held by others." *Higgins v. Pascack Valley Hosp.*, 158 N.J. 404, 426 (1999) (internal quotations and citation omitted). "Whether a particular statement is defamatory depends on its 'content, verifiability, and context.'" *Buying For The Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 325 (D.N.J. 2006) (quoting *Lynch v. New Jersey Educ. Ass'n*, 161 N.J. 152, 164–65 (1999)).  Accordingly, "opinions are not actionable unless they imply false underlying facts." *Id.*  "Whether the meaning of a statement is susceptible of a defamatory meaning is a question of law for the court." *Ward v. Zelikovsky,* 136 N.J. 516, 529 (1994).

Here, Magic alleges that "in the hundreds of letters which T-Mobile sent to Magic's customers, T-Mobile made several non-privileged, knowingly false statements concerning Magic that were intended both to impugn the business reputation and business acumen of Magic (defamation) and to interfere with Magic's current and future business relations with its clients (commercial disparagement)."  Compl. ¶ 146.  Aside from this conclusory recitation of the legal elements, Magic identifies two statements that were "knowingly false" and made "maliciously."

15

Compl. ¶ 126. First, Magic alleges that T-Mobile "falsely claim[ed] to Magic's clients that Magic had presented 'invoices' to T-Mobile, when, in fact, Magic had submitted detailed and comprehensive Claim Packages." Compl. ¶ 124. Second, Magic alleges that, in T-Mobile's March 28–31 letters to the Landlords, T-Mobile falsely asserted that "T-Mobile believes the invoice was issued in error" by Magic. Compl. ¶ 125.

Neither statement amounts to defamation or commercial disparagement, as Magic cannot show that the statements were false or made with malicious intent. Indeed, each statement identified by Magic is nonactionable opinion, as opposed to "specific factual assertions that could be proven true or false." *Ward*, 136 N.J. at 531. With respect to the first statement, Magic fails to allege, and the Court is unable to find, a meaningful difference between the term "invoice" and "Claim Package." Further, Magic fails to set forth how T-Mobile's characterization of its work product as an "invoice" would "expose[] [Magic] to hatred, contempt or ridicule or subject[] [Magic] to a loss of the good will and confidence" of its clients. *Higgins*, 158 N.J. at 426 (internal quotations omitted). As to the second statement, T-Mobile's assertion that it "believes the invoice was issued in error" is plainly an expression of opinion as to its liability under the Leases, as indicated by the express use of the term "believe." Additionally, aside from Magic's conclusory assertion that the statements were made "maliciously," nothing in the Complaint indicates malicious intent on the part of T-Mobile towards Magic via the letters. Rather, the allegations demonstrate that T-Mobile assumed a course of action that it determined was its contractual right under the Leases. The fact that Magic's business was incidentally harmed[4] by the alleged conduct

---

[4] As noted with respect to its tortious interference claim, Magic does not allege damages flowing from T-Mobile's allegedly tortious conduct separate from the loss in revenue it experienced as a result of T-Mobile's refusal to pay the tax reimbursements, which is ultimately governed by the contractual terms of the Leases.

does not amount to malice for purposes of defamation and commercial disparagement claims.

Magic argues, without citation to authority, that any defamation analysis is "premature" at this time and can only proceed "following the completion of discovery" as a matter "for the jury to decide." Pl. Opp. 30, 33. But, as stated above, whether a statement is defamatory is "a question of law for the court." *Ward*, 136 N.J. at 529. Because Magic fails to plead facts demonstrating that the statements in question were false and malicious, Magic's claims for defamation and commercial disparagement cannot survive T-Mobile's motion to dismiss.

### 3. *Promissory Estoppel (Count III)*

A claim for promissory estoppel consists of four elements: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*, 194 N.J. 223, 253 (2008). Notably, "under New Jersey law, liability based on quasi-contractual principles cannot be imposed 'if an express contract exists concerning the identical matter[.]'" *Freightmaster USA, LLC v. Fedex, Inc.*, No. 14-3229, 2015 WL 1472665, at *6 (D.N.J. Mar. 31, 2015) (quoting *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226–27 (3d Cir.1983)).

Here, Magic essentially seeks enforcement of T-Mobile's purported obligations to the Landlords under the Leases via promissory estoppel. Compl. ¶ 153. T-Mobile argues that Magic is barred from doing so because the Leases constitute express contracts governing the tax reimbursement issues between T-Mobile and the Landlords, and Magic is acting as the Landlords' agent for such purposes. Def. Mot. 25. In response, Magic maintains that a claim for promissory estoppel is permissible under the circumstances given that there is no express contract between Magic and T-Mobile. Pl. Opp. 35. The Court acknowledges that whether any reimbursement is

17

owed to Magic on behalf of the Landlords is a matter governed by the individual Leases. However, because of the lack of contractual privity between Magic and T-Mobile, the Court cannot find that Magic's promissory estoppel claim is necessarily barred, nor does T-Mobile cite to any authority indicating otherwise. *Cf. Zydus Worldwide DMCC v. Teva API Inc.*, 461 F. Supp. 3d 119, 141 (D.N.J. 2020) (dismissing promissory estoppel claim where there was "a contract that defines the parties' respective rights and obligations"); *Freightmaster USA, LLC*, 2015 WL 1472665, at *6 (dismissing promissory estoppel claim where an express contract governed the rights of the parties).

That said, Magic's promissory estoppel claim fails for a more fundamental reason: Magic fails to plead facts supporting a clear and definitive promise by T-Mobile to pay the tax reimbursement claims, upon which Magic reasonably relied. "Indefinite promises or promises subject to change by the promisor are not 'clear and definite' and cannot give rise to a claim for promissory estoppel." *Del Sontro v. Cendant Corp., Inc.*, 223 F. Supp. 2d 563, 574 (D.N.J. 2002) (citing *Aircraft Inventory Corp. v. Falcon Jet Corp.*, 18 F. Supp. 2d 409, 416 (D.N.J. 1998)). Despite Magic's insistence that T-Mobile promised to pay the reimbursement claims through "its repeated actions and words," Magic also alleges that T-Mobile repeatedly stated that it was engaged in an audit of the tax reimbursement claims to assess their accuracy and validity. *See* Compl. ¶¶ 52, 60, 66, 91, 101–07. These allegations are incompatible. Indeed, on January 21, 2022, T-Mobile's Director of the Network Supply Chain & Partner Management Department allegedly informed Magic that "T-Mobile is looking into the validity and accuracy of the back tax billings and will advise when we have concluded our review." Compl. ¶ 91. T-Mobile maintained the same posture in February 2022, when it stated multiple times that the tax reimbursement claims were still under review. Compl. ¶¶ 101, 106. As such, T-Mobile's representations with respect

to the reimbursement claims were plainly "subject to change" dependent on the outcome of the review. For the same reasons, any reliance on Magic's part was unreasonable as "reliance upon a mere expression of future intention cannot be 'reasonable,' because such expressions do not constitute a sufficiently definite promise." *Del Sontro*, 223 F. Supp. 2d at 576 (quoting *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1250 (3d Cir. 1989)). Furthermore, insofar as Magic alleges that T-Mobile's past "words and actions" in connection with having previously approved and paid tax reimbursements give rise to a promissory estoppel claim, that premise is misguided. *See* Compl. ¶ 150. T-Mobile's prior approval and payment of certain reimbursement claims amount to transactions with the Landlords, governed solely by the terms of the Leases—not a promise to Magic. Because Magic fails to allege an unconditional promise sufficient to state a claim for promissory estoppel, its claim is dismissed.

### IV.   CONCLUSION

For the reasons set forth above, T-Mobile's motion to dismiss is **GRANTED**. While the Court notes that Magic faces significant legal hurdles moving forward, Magic is afforded 30 days to amend its Complaint to cure any deficiencies. An appropriate Order shall follow.

DATE: September 29, 2022

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. Chief District Judge